DISTRICT COURT, CITY AND COUNTY OF
DENVER, STATE OF COLORADO

1437 Bannock Street
Denver, CO 80202
(720) 865-8301

Plaintiffs:   JOSEPH MARINO and TONIA
MARINO

Defendants:   KYLE KIRKPATRICK, PA-C, MARIA
ASTIZ, M.D., STEPHEN ALTMIN, M.D., CATHOLIC
HEALTH INITIATIVES COLORADO d/b/a Centura
Health-St. Anthony Hospital Central, JEREMIAH
FLEENOR, M.D., MARK WARREN, M.D., SARAH
HUBBELL, M.D., MARK CARVALHO, M.D., MARK
S. TUTTLE, M.D.,WILLIAM G. GASCOYNE, PA-C,
MARK LIU, PA-C,  LESLIE PROCTOR, M.D., PAUL
HAUTAMAA, M.D., SCL HEALTH - FRONT
RANGE, INC. d/b/a Saint Joseph Hospital, KAISER
FOUNDATION HEALTH PLAN OF COLORADO

Attorneys:   Julia T. Thompson
             Schoenwald & Thompson LLC
Address:     1890 Gaylord St.
             Denver, CO  80206
Phone Number:   (303) 837-9000
Fax Number:     (303) 322-3423
E-mails:   juliat@milehighlaw.com

Atty. Reg. No: 25897

▲ COURT USE ONLY ▲

Case Number:
2014CV30130

Div.:          Ctrm:

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, Joseph Marino and Tonia Marino, by and through their attorneys,
Schoenwald & Thompson LLC, bring this Complaint and Jury Demand against and
further states as follows:

### GENERAL ALLEGATIONS

1.     At all relevant times, Plaintiff Joseph Marino (hereinafter "Plaintiff") was
and is a resident of the State of Colorado.


EXHIBIT
C
tabbies®

2.    At all relevant times, Plaintiff Tonia Marino, (hereinafter "Plaintiff Tonia Marino") was and is married to Plaintiff and was and is a resident of the State of Colorado.

3.    At all relevant times, Defendants Kyle Kirkpatrick, PA-C, William G. Gascoyne, PA-C and Mark Liu, PA-C were physician assistants, licensed to practice medicine in the State of Colorado.  Based upon information and belief, Defendants Gascoyne and Liu were employees, agents or representatives of Defendant Kaiser.

4.    At all relevant times, Defendants Maria Astiz, M.D., Stephen Altmin, M.D., Jeremiah Fleenor, M.D., Mark Warren, M.D., Sarah Hubbell, M.D., Mark Carvalho, M.D., Mark S. Tuttle, M.D., Paul Hautmaa, M.D., and Leslie Proctor, M.D. are or were, at all times relevant to this lawsuit, physicians licensed to practice medicine, pursuant to §12-36-106, C.R.S., and held themselves out to the public as physicians specializing in the practice of acute rhabdomyolysis and represented that they provided health care services to persons such as Plaintiff and Plaintiff relied on said representations.

5.    At all relevant times, Defendant Catholic Health Initiatives Colorado d/b/a Centura Health-St. Anthony Hospital Central was a non-profit corporation providing hospital, rehabilitation and other health care services in Colorado ("Defendant St. Anthony").

6.    Defendant St. Anthony is liable for the acts and omissions of its health care providers and other employees or agents, as set forth in this Complaint.  These health care providers, employees and agents, include, but are not limited to, certified nursing assistants, nurses, representatives, officers, staff, and any other persons under the supervision and/or control of the Defendant St. Anthony who provided services to the Plaintiff in the course and scope of their employment with Defendant St. Anthony.

7.    At all relevant times, SCL Health-Front Range, Inc. d/b/a Saint Joseph Hospital was a non-profit corporation providing hospital, rehabilitation and other health care services in Denver, Colorado ("Defendant St. Joseph").

8.    Defendant St. Joseph is liable for the acts and omissions of its health care providers and other employees or agents, as set forth in this Complaint.  These health care providers, employees and agents, include, but are not limited to, certified nursing assistants, nurses, representatives, officers, staff, and any other persons under the supervision and/or control of the Defendant St. Joseph who provided services to the Plaintiff in the course and scope of their employment with Defendant St. Joseph.

9.    Defendant Kaiser Foundation Health Plan of Colorado is a Colorado professional corporation, which is organized and exists pursuant to the laws of the State of Colorado utilizing agents and employees to provide health care services ("Defendant

2

Kaiser"). Defendant Kaiser's registered agent for service of process is located in Denver, Colorado.

10.     Defendant Kaiser is liable for the acts and omissions of its health care providers and other employees or agents, as set forth in this Complaint. These health care providers, employees and agents, include, but are not limited to, certified nursing assistants, nurses, representatives, officers, staff, and any other persons under the supervision and/or control of the Defendant Kaiser who provided services to the Plaintiff and/or were responsible for his transfer from Defendant St. Anthony to Defendant St. Joseph, in the course and scope of their employment with Defendant Kaiser.

11.     The term "Defendant" or "Defendants" as used herein. includes the employees, agents, representatives, staff and any other persons under the supervision of and/or control of the named Defendants, as well as their predecessors and successors in interest.

12.     This Court has subject matter jurisdiction.

13.     Venue is this Court is proper pursuant to C.R.C.P. 98(c) because Defendant SCL Health-Front Range, Inc., has its principal place of business in the City and County of Denver, State of Colorado, Defendant Kaiser has its registered agent in the City and County of Denver, and many of the tortious actions occurred in the City and County of Denver.

## FACTUAL ALLEGATIONS

14.     On or about January 9, 2012, Plaintiff was involved in his first day of training at the Colorado State Patrol where he had continuous exercise routines in excess of ten hours.

15.     On or about January 10, 2012, Plaintiff began training again with the Colorado State Patrol wherein he developed sharp pain in his thighs, bilaterally, causing him to fall to the ground and hit his knees.

16.     On or about January 10, 2012, Plaintiff presented to a Concentra Urgent Care due to his problems, but the providers at Concentra determined he should be seen in an emergency room.

17.     On or about January 10, 2012, another State Patrol cadet was transported to Concentra.

18.     On or about January 10, 2012, Plaintiff was transported by ambulance to the emergency department at Defendant St. Anthony and was triaged at approximately 1228.

19.     On or about January 10, 2012, Plaintiff informed the staff at Defendant St. Anthony that he suffered an injury at work as Colorado State Patrol cadet.

20.     On or about January 10, 2012, upon arrival at Defendant St. Anthony, Plaintiff was wearing clothing with "Colorado State Patrol" imprinted.

21.     On or about January 10, 2012, after arriving at Defendant St. Anthony, Plaintiff's pants had to be cut off and underneath these pants were shorts imprinted with "Colorado State Patrol."

22.     On or about January 10, 2012, when the staff at Defendant St. Anthony's requested Plaintiff's personal insurance information, Plaintiff said that it was a work related injury.

23.     On or about January 10, 2012, despite Plaintiff's claims that he suffered a work related injury, the staff at Defendant St. Anthony obtained Plaintiff's personal health insurance information in case workers compensation did not cover his stay.

24.     On or about January 10, 2012, in triage, Plaintiff was experiencing excruciating pain and swelling his thighs and knees, and had numb/tingling to his feet.

25.     On or about January 10, 2012, Plaintiff was evaluated by Defendant Kirkpatrick.   Plaintiff was also seen by Defendant Altmin who was supervising Defendant Kirkpatrick.

26.     On or about January 10, 2012, Defendant Kirkpatrick noted that Plaintiff's urine was dark brown.

27.     On or about January 10, 2012, Plaintiff reported to Defendant Kirkpatrick that he could bear weight but that it was extremely difficult and painful to his thighs.

28.     On or about January 10, 2012, Defendant Kirkpatrick's examination revealed mild soft tissue swelling in Plaintiff's knees and moderate tenderness in the right lateral mid shaft of Plaintiff's thigh.

29.     Laboratory values obtained while Plaintiff was in the Emergency Department at Defendant St. Anthony revealed that his creatinine kinase was 58,034.

30.     At no time did Defendant Kirkpatrick nor Defendant Altmin refer Plaintiff for an orthopedic consultation despite the findings of rhabdomyolysis and swelling in his legs.

31.     Defendant Kirkpatrick referred Plaintiff for admission and the admission process was started by Defendant Astiz.

4

32.    On or about January 10, 2012, after the initial evaluation and determination to admit Plaintiff, and with full knowledge of the signs and symptoms described more fully above, Defendant Astiz ordered Plaintiff to be admitted, but did not request an immediate orthopedic consult.

33.    On or about January 10, 2012, an employee of Defendant St. Anthony contacted Defendant Kaiser and notified it that they had a patient who had health insurance through their plan.  Based upon information and belief, Defendant Kaiser determined that Plaintiff should be treated at Defendant St. Joseph, a Defendant Kaiser facility.

34.    On or about January 10, 2012, Defendant St. Anthony was a Level 1 Trauma Center.

35.    On or about January 10, 2012, Defendants Kirkland and Altmin determined that Plaintiff could be transported to Defendant St. Joseph.

36.    Prior to the determination to transport Plaintiff to Defendant St. Joseph, another Colorado State Patrol cadet arrived at Defendant St. Anthony with similar complaints as Plaintiff.

37.    Prior to the determination to transport Plaintiff to Defendant St. Joseph, the other State Patrol cadet who had been seen in the emergency room, had an emergent orthopedic consultation and immediate fasciotomy due to acute exertional compartment syndrome.

38.    Plaintiff informed the staff and employees at Defendant St. Anthony that he did not want to be transferred to Defendant St. Joseph.

39.    At or around the time of the decision to transfer Plaintiff to Defendant St. Joseph, three fully uniformed troopers from the Colorado State Patrol visited Plaintiff in the emergency department, including the Captain of the Colorado State Patrol Training Academy.

40.    Based upon information and belief, no employee, agent or representative of Defendant St. Anthony attempted to ascertain from the other Colorado State Patrol troopers, including the Captain, whether workers compensation insurance would cover Plaintiff.

41.    At no time prior to the transfer to Defendant St. Joseph was Plaintiff apprised of the risks of being moved from a Level 1 Trauma Center to Defendant St. Joseph.

42.    Defendants Kirkpatrick and Altmin signed an EMTALA transfer form which stated "The patient has been examined and any emergency medical condition

stabilized such that, within reasonable clinical confidence, no material deterioration of the patient's condition…is likely *to result from* or occur during the transfer." (emphasis supplied).

43.     At no time prior to the transfer to Defendant St. Joseph was Plaintiff provided with the opportunity to pay for his care and treatment at Defendant St. Anthony if his care was deemed not to be related to workers compensation.

44.     On or about January 10, 2012, Defendant Fleenor agreed to accept Plaintiff at Defendant St. Joseph Emergency Department's Observation Unit.

45.     On or about January 10, 2012, Plaintiff arrived at Defendant St. Joseph at approximately 19:38.

46.     On or about January 10, 2012, Plaintiff was evaluated by Defendant Warren, an emergency physician.

47.     On or about January 10, 2012, Defendant Warren knew or should have known that Plaintiff was suffering from rhabdomyolysis, swollen thighs and bilateral thigh pain. The swelling and pain were so bad that ice was applied to his thighs.

48.     On or about January 10-11, 2012, Defendant Fleenor evaluated and treated Plaintiff and knew him to have rhabdomyolysis, pain in his thighs and swollen thighs and prescribed morphine and Percocet.

49.     On or about January 10, 2012, the nursing staff at Defendant St. Joseph knew that Plaintiff's pain was exacerbated with motion. Based upon information and belief, this pain was not reported to the physicians.

50.     On or about January 11, 2012, ice was applied by nurses at Defendant St. Joseph.

51.     On or about January 11, 2012, Defendant Carvalho admitted Plaintiff to Defendant St. Joseph while supervising resident physicians.

52.     On or about January 11, Defendant Carvalho evaluated and treated Plaintiff and knew him to have rhabdomyolysis, pain in his thighs, swollen thighs and was unable to walk. Defendant Carvalho further knew that Plaintiff could hardly move his legs due to pain, had decreased range of motion, and pins and needles from his lower extremities up to his hips. Plaintiff was also unable to flex or extend his knees bilaterally due to limitations from pain in his thighs.

53.     On or about January 11, 2012, Defendant Carvalho did not request an immediate orthopedic consult.

54.    On or about January 11, 2012, Defendant Tuttle, an orthopedist, evaluated and treated Plaintiff and knew him to have rhabdomyolysis, pain in his thighs, swollen thighs and was unable to walk. Defendant Tuttle further knew that Plaintiff had pain on passive range of motion. Defendant Tuttle did not perform a stryker test.

55.    During January 11, 2012, Plaintiff reported to the nursing staff that he was experiencing unrelenting pain.

56.    On or about January 12, 2012, Plaintiff reported to the nursing staff that he experienced feelings of pins and needles in his feet after attempting to ambulate.

57.    On or about January 12, 2012, Plaintiff continued to report unrelenting pain to the nursing staff at Defendant St. Joseph. Based upon information and belief, these complaints were not provided to the physicians.

58.    On or about January 12, 2012, Defendant Gascoyne evaluated and treated Plaintiff and knew him to have rhabdomyolysis, pain in his thighs, swollen thighs, was unable to walk without a walker and had decreased range of motion especially when flexing or extending his lower extremities.

59.    On or about January 12, 2012, Defendant Hubbell evaluated and treated Plaintiff and knew him to have rhabdomyolysis, pain in his thighs, swollen thighs and was unable to walk.

60.    On or about January 13, 2012, Defendant Liu, an orthopedic physician assistant, evaluated and treated Plaintiff and knew him to have rhabdomyolysis, pain in his thighs, swollen thighs and was unable to walk. Defendant Liu determined that Plaintiff was ready for discharge and discharged him from the orthopedic service.

61.    On or about January 13, 2012, Defendant Hubbell knew or should have known that Plaintiff needed a great deal of pain medication on January 12, 2012.

62.    On or about January 13, 2012, Defendant Hubbell failed to recognize that Plaintiff had been discharged from the orthopedic service.

63.    On or about January 14, 2012, Defendant Hautamaa approved of the discharge of Plaintiff from the orthopedic service without evaluating Plaintiff.

64.    On or about January 14, 2012, Defendant Hubbell evaluated and treated Plaintiff and knew him to have rhabdomyolysis, pain in his thighs, swollen thighs and was unable to walk. Defendant Hubbell did not request another orthopedic consult.

65.    From January 14-15, 2012, Defendant Proctor treated Plaintiff and knew him to have rhabdomyolysis, pain in his thighs and swollen thighs. Despite this

knowledge, she recommended on January 15, 2012, that Plaintiff be discharged to a skilled nursing facility.

66.     On or about January 15, 2012, Plaintiff refused to be discharged to a skilled nursing facility.

67.     From January 15-January 17, 2012, Defendant Proctor treated Plaintiff and knew him to have rhabdomyolysis, pain in his thighs and swollen thighs.   At discharge, Defendant Proctor knew that Plaintiff still had difficulty walking to the bathroom even with assistance by one or two providers, a walker and a gait belt.  Despite this knowledge, she planned to discharge him to skilled nursing facility with no orders to follow him for potential compartment syndrome.

68.     On or about January 17, 2012, prior to discharge from Defendant St. Joseph, Plaintiff still suffered from profound bilateral weakness in his lower extremities.

69.     On or about January 17, 2012, Plaintiff was discharged to Defendant St. Anthony for rehabilitation.

70.     From January 11, 2012-January 17, 2012, Plaintiff continually complained to the nursing and physical therapy staff, as well as to the above identified physicians, of unrelenting pain in his thighs and concerns about the amount of swelling.

71.     On or about February 3, 2012, Plaintiff still could not stand on his own.

72.     On or about February 3, 2012, Plaintiff Tonia Marino saw the state patrol cadet who had a fasciotomy standing and brushing his teeth and started to investigate why this cadet had made significantly more progress than her husband.

73.     On or about February 3, 2012, Plaintiff was diagnosed with compartment syndrome.

74.     As a direct and proximate result of Defendants' liability to Plaintiff as alleged in this Complaint,  Plaintiff has suffered and will continue to suffer injuries, damages and losses, including, but not limited to: permanent disfigurement and functional impairment; increased risk of future complications; the past and future need for additional medical, hospital and rehabilitative care and treatment; past and future pain, mental anguish, emotional distress and psychological complications; loss of income and impaired earning capacity; expenditure of money for past and future medical, hospital and rehabilitative care and treatment; permanent disability; as well as the loss of enjoyment of life and other economic and noneconomic damages recoverable by law.

## FIRST CLAIM FOR RELIEF

(Negligence of Maria Astiz, M.D., Stephen Altmin, M.D., Jeremiah Fleenor, M.D., Mark Warren, M.D., Sarah Hubbell, M.D., Mark Carvalho, M.D., Mark S. Tuttle, M.D., Paul

Hautmaa, M.D., Leslie Proctor, M.D., Kyle Kirkpatrick, PA-C, William G. Gascoyne, PA-C, and Mark Liu, PA-C Defendants)

75.     Plaintiff adopts all other paragraphs in this Complaint as separately alleged in this claim for relief.

76.     Defendents Maria Astiz, M.D., Stephen Altmin, M.D.,  Jeremiah Fleenor, M.D., Mark Warren, M.D., Sarah Hubbell, M.D., Mark Carvalho, M.D., Mark S. Tuttle, M.D., Paul Hautmaa, M.D., Leslie Proctor, M.D., Kyle Kirkpatrick, PA-C, William G. Gascoyne, PA-C, and Mark Liu, PA-C (collectively "Physician and Physician Assistant Defendants"), and each of them, voluntarily entered into either a physician-patient or a physician assistant-patient relationship with Plaintiff, and, as such, they owed Plaintiff the duty to act as a reasonably careful physician or physician assistant would have acted, under the same or similar circumstances, in treating and caring for him.  These Defendants deviated from the applicable standard of care, and their negligence includes, but is not limited to one or more of the following:

a.      Failure to take reasonable steps and precautions to prevent, minimize and/or reduce injuries to Plaintiff, including, but not limited to, neurovascular and other tissue injuries;

b.      Failure to reasonably assess and respond to Plaintiff's complaints during their individual evaluations of him;

c.      Failure to recognize that the signs and symptoms of Plaintiff, especially that the rhabdomyolysis and leg pain were highly suspicious of being from exercise induced compartment syndrome;

d.      Failure to properly coordinate care amongst the various treatment providers and treatment facilities;

e.      Failure to perform or order appropriate diagnostic tests, including a stryker evaluation; and

f.      Failure to reasonably respond to Plaintiff's complaints and conditions, including the failure to promptly obtain emergent surgical assessment and intervention for Plaintiff.

77.     The Physician and Physician Assistant Defendants, each of them, breached their duties to Plaintiff, and their breaches, and the breaches of each of them, proximately caused Plaintiff to suffer damages as set forth herein.

78.     As a direct and proximate result of these Defendants, Plaintiff suffered injuries, damages and losses as described herein.

## SECOND CLAIM FOR RELIEF
### (Vicarious Liability/Respondeat Superior against
### Defendants Altmin and Hautamaa)

79.     Plaintiff adopts all other paragraphs in this Complaint as if they were separately alleged in this claim for relief.

80.     Section 12-36-106(5)(b)(I), C.R.S., requires, in part, for physician assistants performing acts which constitute the practice of medicine. that "the act[s] shall not be performed except under the personal and responsible direction and supervision of a person licensed . . . to practice medicine . . . .

81.     The Board has provided in 3 Colo. Code Regs. § 713-7 that its rules are designed to make the primary physician supervisor responsible for the conduct of the physician assistant unless another physician, the secondary physician supervisor, clearly assumes responsibility.

82.     Pursuant to 3 Colo. Code Regs. § 713-7: Defendant Altmin was the primary and/or secondary physician supervisor for Defendant Kirkpatrick; Defendant Hautamaa was the primary and/or secondary physician supervisor for Defendant Liu.

83.     Defendant Altmin is vicariously liable for any negligence by Defendant Kirkpatrick.

84.     Defendant Hautamaa is vicariously liable for any negligence by Defendant Liu.

85.     As a direct and proximate result of these Defendants, Plaintiff suffered injuries, damages and losses as described herein.

## THIRD CLAIM FOR RELIEF
### (Negligence – Direct and Through Vicarious Liability –
### Defendant St. Anthony and Defendant St. Joseph)

86.     Plaintiffs incorporate by reference all other paragraphs in this Complaint.

87.     Defendant St. Anthony and Defendant St. Joseph (collectively "Defendant Hospital") had a duty to Plaintiff directly and through its employees, agents and representatives, to take reasonable steps and precautions to prevent or minimize injuries to Plaintiff, and persons such as Plaintiff, and Defendant Hospital breached this duty through its negligence.

88.     Defendant Hospital's employees were negligent in failing to adequately treat Plaintiff.   Said negligence includes, but is not limited to:

10

a. Actions and inactions which increased Plaintiff's risk of having undiagnosed compartment syndrome;

b. Failure to obtain and coordinate adequate intervention by physicians or other health care professionals to avoid or minimize the risk of having undiagnosed compartment syndrome;

c. Failure to follow the orders of the physicians; and

d. Failure by caregivers to adequately communicate among themselves and with physicians to avoid or minimize injuries suffered by Plaintiff including undiagnosed compartment syndrome.

89. The persons for whom Defendant Hospital is vicariously liable were acting within the scope and course of their employment with Defendant Hospital.

90. Defendant Hospital was directly negligent in its care and treatment of Plaintiff and that negligence includes, but is not limited to, one or more of the following:

a. Failure to implement adequate policies and procedures for evaluating, treating, attending to and protecting patients, such as Plaintiff;

b. Failure to adequately supervise and train its employees to reasonably protect persons such as Plaintiff from injuries and to coordinate and communicate with other hospital employees and representatives for that purpose;

c. Failure to employ personnel with expertise in caring for, attending to and monitoring patients such as Plaintiff;

d. Inadequate policies, procedures and guidelines for determining how a patient such as Plaintiff should be treated for rhabdomyolysis and compartment syndrome;

e. Inadequate policies, guidelines and procedures to define and coordinate the roles of nurses, attendants and other caregivers to provide reasonable safety for patients, such as Plaintiff; and

f. Inadequate promulgation and implementation of policies, procedures and guidelines for written and oral communications between caregivers about patients with special needs.

91. As a result of the negligence of Defendant Hospital, Plaintiff suffered injuries damages and losses as more fully described herein.

11

## FOURTH CLAIM FOR RELIEF
### (Negligence – Defendant Kaiser)

92.     Plaintiffs incorporate by reference all other paragraphs in this Complaint.

93.     Defendant Kaiser had a duty to Plaintiff directly and through its employees, agents and representatives, to take reasonable steps and precautions to prevent or minimize injuries to Plaintiff, and persons such as Plaintiff, and Defendant Hospital breached this duty through its negligence.

94.     Defendant Kaiser's employees were negligent in failing to adequately treat Plaintiff.  Said negligence includes, but is not limited to:

a.     Actions and inactions which increased Plaintiff's risk of having undiagnosed compartment syndrome;

b.     Failure to obtain and coordinate adequate intervention by physicians or other health care professionals to avoid or minimize the risk of having undiagnosed compartment syndrome;

c.     Failure to follow the orders of the physicians; and

d.     Failure by caregivers to adequately communicate among themselves and with physicians to avoid or minimize injuries suffered by Plaintiff including undiagnosed compartment syndrome.

95.     The persons for whom Defendant Kaiser is vicariously liable were acting within the scope and course of their employment with Defendant Kaiser.

96.     As a result of the negligence of Defendant Kaiser, Plaintiff suffered injuries damages and losses as more fully described herein.

## FIFTH CLAIM FOR RELIEF
### (EMTALA – Failure to Provide Required and Stabilization Care and Treatment – Defendant St. Anthony)

97.     Plaintiff adopts all other paragraphs in this Complaint as if they were separately alleged in this claim for relief.

98.     EMTALA, 42 U.S.C. § 1395dd(b)(1) states:

(1)     In general. If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either –

12

(A)      within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B)      for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

99.   EMTALA, 42 U.S.C. § 1395dd(e)(1)(A) states:

(1) The term "emergency medical condition" means –

(A) A medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in –

(i) Placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy.

(ii) Serious impairment to bodily functions; or

(iii) Serious dysfunction of any bodily organ or part.

100.   EMTALA, 42 U.S.C. § 1395dd(e)(3)(A) states:

(3)(A) The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility.

101.   When Plaintiff presented to the emergency department at Defendant St. Anthony on January 10, 2012, he had an emergency medical condition as defined by 42 U.S.C. § 1395dd(e)(1)(A).

102.   On information and belief, at all times material herein, Defendant Kirkpatrick had actual knowledge that Plaintiff had an emergency medical condition as defined by 42 U.S.C. § 1395dd(e)(1)(A) at all relevant times.

103.   On information and belief, at all times material herein, Defendant St. Anthony, by and through its agents and employees had actual knowledge that Plaintiff had an emergency medical condition as defined by 42 U.S.C. § 1395dd(e)(1)(A) at all relevant times.

104.   Plaintiff received a medical screening examination in the emergency room at Defendant St. Anthony by Defendants Kirkpatrick and Altmin and by agents and employees of Defendant St. Anthony .

105.    When Plaintiff presented to the emergency department at Defendant St. Anthony on January 10, 2012, he had signs and symptoms of compartment syndrome.

106.    On January 10, 2012, Defendants Kirkpatrick and Altmin knew or should have known that Plaintiff had an emergency medical condition as defined by 42 U.S.C. § 1395dd(e)(1)(A).

107.    Despite having the knowledge that Plaintiff had an emergency medical condition as defined by 42 U.S.C. § 1395dd(e)(1)(A), Defendant St. Anthony, by and through its duly authorized agents and employees, failed to stabilize Plaintiff as defined by 42 U.S.C. § 1395dd(e)(3)(A).

108.    On information and belief, Defendant St. Anthony, by and through its agents and employees failed to provide treatment as may be required to stabilize Plaintiff's condition pursuant to 42 U.S.C. § 1395dd(b)(1).

109.    Defendant St. Anthony, by and through its agents and employees had the expertise and capabilities to treat Plaintiff's rhabdomyolysis and compartment syndrome prior to transfer.

110.    Defendant St. Anthony violated the requirements of 42 U.S.C. § 1395dd(b).

111.    As a result of Defendant St. Anthony 's violation of the requirements of 42 U.S.C. § 1395dd(b), Plaintiff suffered the injuries, damages and losses as more fully described herein and permitted pursuant to 42 U.S.C. § 1395dd(d)(2)(A).

## SIXTH CLAIM FOR RELIEF
### (EMTALA – Failure to Restrict Transfer until Individual Stabilized – Defendant St. Anthony ).

112.    Plaintiff adopts all other paragraphs in this Complaint as if they were separately alleged in this claim for relief.

113.    EMTALA, 42 U.S.C. § 1395dd(c)(1) states:

> (1) Rule. If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual unless- -
> (A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligation under this section and of the risk of transfer, in writing requests transfer to another medical facility,
> (ii) a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that based upon the

information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risk to the individual and . . .

(B) The transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

114.    EMTALA, 42 U.S.C. § 1395dd(c)(2) states:

(2) Appropriate Transfer. An appropriate transfer to a medical facility is a transfer- -

(A) In which the transferring hospital provides the medical treatment within its capacity which minimizes the risk to the individual's health and, in the case of a woman in labor, the health of the unborn child:

(B) In which the receiving facility- -

(i) has available space and qualified personnel for the treatment of the individual, and

(ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

(C) in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of transfer, including records related to the individual's emergency medical condition, observation of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C) of this section) who has refused or failed to appear within a reasonable time to provide necessary stabilization treatment:

(D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer, and

(E) which meets such other requirements as the Secretary may find necessary and in the interests of the health and safety of individuals transferred.

115.    Defendant St. Anthony through its agents and employees had information that it could have provided additional treatment within its capacity, which would have minimized the risk to Plaintiff's health.

116.   Defendant St. Anthony, through its agents and employees, could have sent Plaintiff to the operating room to perform surgery or packed the patient, which would have minimized the risk to Plaintiff's health prior to transfer.

117.   Defendant St. Anthony failed to provide additional treatment within its capacity which would have minimized the risk to Plaintiff's health pursuant to 42 U.S.C. § 1395dd(c)(1).

118.   Defendant St. Anthony failed to appropriately transfer Plaintiff pursuant to 42 U.S.C. § 1395dd(c)(2).

119.   On information and belief, Defendant St. Anthony, through its agents and employees, had information that additional treatment could have been provided and the risks of transfer were not outweighed by the medical benefits reasonably expected by transferring Plaintiff to another facility.

120.   Defendant St. Anthony through its agents and employees, failed to provide an adequate summary of the risks and benefits in the certification by failing to document that one of the risks of transfer was damage from untreated compartment syndrome.

121.   Defendant St. Anthony through its agents and employees, failed to inform Plaintiff that one of the risks of transfer was being transferred to a hospital that was not a Level 1 Trauma Center.

122.   On information and belief, Defendant St. Anthony through its agents and employees, had information that additional treatment could have been provided over and beyond that which was communicated to Plaintiff, thus Plaintiff consented to transfer Plaintiff based on false information.

123.   Defendant St. Anthony through its agents and employees  misrepresented the benefits of transfer.

124.   Plaintiff signed the Certification of Transfer based upon the false belief that Defendant St. Anthony provided all medical treatment within its capacity which could minimize the risk of Plaintiff's health.

125.   Defendant St. Anthony failed to provide such medical treatment to Plaintiff, which was necessary to assure, within reasonable probability that no material deterioration of Plaintiff's condition was likely to result during transfer.

126.   Defendant St. Anthony, by and through its agents and employees transferred Plaintiff out of its emergency department.

127.    Plaintiff suffered from undiagnosed compartment syndrome while at Defendant St. Joseph.

128.    Defendant St. Anthony violated the requirements of 42 U.S.C. § 1395dd(c).

129.    As a result of Defendant St. Anthony's violation of the requirements of 42 U.S.C. § 1395dd(c) as set forth above, Plaintiff has suffered personal harm, consisting of both economic and noneconomic damages and losses, and is entitled to equitable relief in the form of monetary relief as is appropriate, in an amount to be determined at trial, pursuant to 42 U.S.C. § 1395dd(c).

### SEVENTH CLAIM FOR RELIEF
(Defendant St. Anthony and Defendant Kaiser Foundation Health Plan
– Negligent Transfer)

130.    Plaintiff hereby incorporates all other paragraphs in this Complaint.

131.    Defendant St. Anthony and Defendant Kaiser Foundation Health Plan, by and through their employees, agents, representatives and staff, were negligent in having Plaintiff transferred from Defendant St. Anthony to Defendant St. Joseph Hospital.

132.    Defendant St. Anthony and Defendant Kaiser Foundation Health Plan failed to properly investigate Plaintiff's claims that he was injured while at work and it was negligent not to investigate this allegation before transferring him to a Kaiser Foundation Health Plan of Colorado facility, i.e. Defendant St. Joseph Hospital.

133.    At the time of the transfer from Defendant St. Anthony to Defendant St. Joseph, Defendant St. Anthony knew, or should have known, that one other cadet had presented to Defendant St. Anthony and had an emergent fasciotomy.

134.    Defendant St. Anthony was negligent in failing to inquire of the Colorado State Patrol troopers, who were in supervisory positions, whether workers compensation insurance would cover Plaintiff's care.

135.    Defendant Kaiser was negligent in directing Defendant St. Anthony to transport Plaintiff to its facility, Defendant St. Joseph, and that negligence includes, but is not limited to:

    a.  Failing to speak with its insured, Plaintiff, regarding the transfer;

    b.  Failing to provide Plaintiff the opportunity to pay for his care at Defendant St. Anthony.

136.    Had Plaintiff been properly informed by Defendant St. Anthony and/or Defendant Kaiser he would have refused to be transferred to Defendant St. Joseph and not signed the transfer form.

137.    As a result of the negligence of Defendant St. Anthony and Defendant Kaiser Foundation Health Plan, Plaintiff suffered injuries damages and losses as more fully described herein.

### SEVENTH CLAIM FOR RELIEF
(Loss of Consortium)

138.    Plaintiff hereby incorporates all other paragraphs in this Complaint.

139.    As a direct and proximate result of the negligence by Defendants, causing injuries to Plaintiff Joseph Marino as set forth in this Complaint, Plaintiff Tonia Marino has suffered a loss of consortium.

140.    Defendants are liable to Plaintiff Tonia Marino, as the wife of Plaintiff, for damages related to loss of consortium and having to provide nursing care and services, as well as essential home services which her husband can no longer perform.

141.    As a direct and proximate result of the alleged liability of the Defendants, as set forth in this Complaint, Plaintiff Tonia Marino, as the wife of Plaintiff Joseph Marino, has incurred damages including, but not limited to, emotional pain and suffering related to loss of consortium including, but not limited to, the loss of affection, society, companionship of her husband and having to provide nursing care and extraordinary care/services as well as essential home services which her husband can no longer perform as well as cost and expenses of necessary medical and other necessities.

**WHEREFORE,** Plaintiffs pray that judgment be entered in their favor and against Defendants for general and special damages in an amount which will fully and fairly compensate them for their injuries and damages both past and future. Plaintiffs further pray that the court award prejudgment and post judgment interest as permitted by Colorado law, costs of this suit, expert witness fees, and for such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial to a jury of six on all issues.

Respectfully submitted this 31st day of January, 2014

SCHOENWALD & THOMPSON LLC

*Original of this pleading is at the office*
*of the undersigned*

/Julia T. Thompson

By: _____

Julia T. Thompson

Plaintiffs' address is as follows:

7575 Pintail Court
Littleton, CO 80125